So before we start, welcome to the Ninth Circuit for Argument, and each of you is to keep your own time. If you want to reserve time, let me know, but we're not going to watch your time for you. Proceed. Thank you. Thank you, Judge Berzon, and may it please the Court. The question presented in this case is whether in a civil rights trial involving the use of excessive force by law enforcement officers, that trial can be called fair when all of the witnesses for one side wrongly refuse to say what they know and the district judge wrongly refuses any authority to do anything about it. The answer to that question is no, and this case should therefore be vacated and remanded for a retrial. I think it's helpful to sort of set the stage about what happened right before things went off the rails in this trial. By that point in the proceeding, Mr. Barnett had secured the attendance of these three witnesses over the objection of the officers. All three of them had to be brought to court, because they were all prisoners, by writs of habeas corpus and at substantial expense. He had also told the jury in his opening statements, understanding perfectly well that if it was just a swearing contest between him and three officers, his odds weren't very good, he told the jury, you will hear from three people who saw what happened. They didn't hear about what happened, they didn't sort of get news from someone else. They saw it and they're going to tell you exactly what happened, one of whom was his cellmate. And then when he calls his first witness, this is Mr. Johnson, in view of the jury, that witness not only refuses to answer, but refuses to answer any questions at all. He won't even answer foundational questions like, was I your cellmate at the time? Were you imprisoned at this facility at the time? And he won't say why he won't answer. He just says, I don't want anything to do with this. Now, at that point, the logical action for the magistrate would have been to, for example, direct the witness to answer or do any number of the things that we canvass in our briefs that are available to judges who are managing trials. But instead, the literal perfect opposite of that happened, which is the witness's failure was sanctioned by the magistrate, who said, if he's not going to answer, there isn't anything I can do about it. And that pattern repeated itself over the course of all three of the witnesses. In other words, this also isn't in the case of the magistrate. This is an example where just one witness, who may or may not have added anything, who may or may not have had anything that's different than anyone else to say. It's not a case where just one, in other words, witness is sort of an isolated example. This is a case where all of the witnesses for one side, the only people who could possibly have broken the tie between the two versions of the story that were given, refused to do anything, refused to say anything, and the magistrate doesn't do anything about it at any point. Now, we think that there's a substantial case to be made that that is more than just a little bit harmful in circumstances like these. And moreover, Mr. Barnett, although he's pro se, he's not represented at this point, he objects to this in words that placed the magistrate on notice. He says, during the critical exchanges, he complains to the Court, and he says in so many words, I don't understand what the purpose of bringing all of these witnesses here to testify was if they're just going to be He doesn't sort of use the same words that we used in the opening brief to describe the problem here. But nonetheless, the magistrate is on notice because the response is, well, I can't really do anything about it. And this pattern repeats itself over and over. Sotomayor Does it matter to this case whether we treat this as plain error or as objected to? I don't think that it matters for the result, because I believe that we can or we think we've satisfied the plain error standard, because this is such an extreme set of facts and the error is so basic. And the effect on the trial is just so enormous. It's almost impossible to imagine, you know, a more extreme set of facts with all of the witnesses. So I don't think there's actually a need to decide whether plain error applies here or not, because even if, even under the standards applicable to pro se litigants, he isn't deemed to have placed the magistrate judge on notice, then this really belongs in that class of errors that really the magistrate judge ought to have noticed on, without an objection. That's especially Counsel, one question. There seems to have been a lot of discussion during the hearings and during the trial about whether a witness would testify voluntarily or not. And I was trying to figure out why there was such a focus on that. I've called hundreds of witnesses in my career, and unless they were taking the fifth, they don't get to opt out. Can you help me and maybe my colleagues understand, is it the standing order in the Eastern District of California about how to bring prisoners over? And there seems to be a different process if it's voluntary or not voluntary. Why were there so much discussion about that? I have that same question, to tell you the truth, because I share that understanding, which is that witnesses do not get to decide whether they will give evidence to the court. The entire purpose of a writ of habeas corpus ad testificandum is you are brought over your objection. In fact, the witnesses made pretty clear they didn't want to testify. It wasn't a question when they got to the courtroom whether they wanted to be there. They had all, at least I think Mr. King, and there were indications that the same was true of the other two, had said, I don't want to be here. And as I correctly note, that isn't the question. The question is not whether the witness finds it convenient or interesting or beneficial to say what he knows. I mean, the government frequently emphasizes that trial courts are entitled to every person's evidence, and that is the truth-finding process. That's the whole reason that they can be brought there against their will. And so, you know, I don't really know why there was this focus on whether the person would testify voluntarily or not, except to say that on the record they had been ordered to appear whether they wanted to or not. And it was perfectly clear from the moment they got into the courtroom that they didn't want to be there. And so I share Mr. Barnett's question, which is, if that was known in advance and if they were brought to court anyway, as the officers noted in their opposition to the motion to make these witnesses appear, at substantial expense, I think each of them had to be transported by something like three guards. So this was not a trivial exercise to just bring them over for the afternoon. This was a serious undertaking. And to know that, and to know that they don't want to testify voluntarily, and then to let them do so anyway with no attempt made at all, not even the most sort of gentle pressure or certainly nothing more than gentle pressure being applied, is inexplicable, I think. And I — Alitoson Was there any — did the witnesses have any options prior to having the subpoena issued to them to tell — to indicate that they feared for their lives, that they didn't want to testify and get the opt-out before they were brought into court? So Mr. King did file a — he filed something with the court indicating that he did not want to do this. And I think all of the witnesses had been spoken to by, you know, counsel for the other side and had indicated that they didn't want to do this. And the magistrate was aware of this when the writs issued. This was the main sort of purpose of the opposition to Mr. Barnett's motion for the writs to make these witnesses appear, is that they had indicated — Sotomayor Did they say anything about threats? I'm sorry? Sotomayor Did they say anything about threats as why they didn't want to? They didn't, no. They said essentially in the same words they said at trial, I have nothing to add to this matter. And one of them was asked about threats at trial and said there weren't any threats. One of them was asked by Mr. Barnett. I think this is Mr. King. If he had been threatened by anyone and he said no, the other two were not asked about this, and none were asked by the magistrate judge. Mr. Barnett asked and one of them said no, but there was, you know, he was uncooperative and there was no follow-up. Kagan I mean, just in reviewing the options. I mean, I gather the argument of the government in the briefs and it's going to be here is that because they were prisoners, there was, as a practical matter, nothing she could do, although she didn't say it that way. It was just shorthand for because you're prisoners, there's nothing I can do. So the question is what could she or should she have done? So I would divide the possible responses into soft authority and hard authority. So the soft authority of a judge in his or her courtroom is immense, and that is part of why trial judges and magistrate judges running trials have so much discretion over how they manage their courtrooms, because even just directing a witness to answer is not such an easy thing to defy. But I think the sort of soft reserves of authority are pretty well understood. And he Could she take, have in-camera meetings with them and say why don't you want to testify? I don't see any reason why not. And certainly she could have asked in herself on the record why don't you want to testify, or even just if they would, you know, answer her questions rather than his. These are all the kinds of things, and there are a lot of tools in this toolkit that judges have for very good reason, because a big part of the job of a district judge sometimes is wrangling witnesses who really don't want to say what they know but are required to. And then there's the hard authority. I take the point that these are prisoners and you can't sort of threaten to double imprison them. What you can do, however, and we give a lot of examples, but the easiest one to my mind to understand is you can threaten to fine them. And a contempt fine is not something that a prisoner can just sort of ignore, because prisoners have money. They have trust accounts, and those trust accounts don't fill up very quickly. And you can sort of – there's actually an instance in this very case, if you look at the docket sheet on Excerpts of Record V, Mr. Barnett went to the trouble to get a refund of his partial filing fee, which was in the amount of $98, and he went to the trouble to file a motion to do that. That is because even if you're in prison, there are canteens. You can buy things. You can, you know, there are – I mean, it's not very much, and you earn it slowly, and there are limits on how much, you know, your family and friends can send you, but they have some money. They can do things like file lawsuits. And so a note from – or a point made by a magistrate judge that if you do not answer, I can hold you in contempt, and I don't know if you know this or not, but that can mean whatever money you have is going to be gone. Now, maybe you'd like to reconsider your failure to answer the question. Of course, we can't prove that that would have worked, but it seems to me like the kind of threat that routinely compels witnesses or motivates them to answer, and even if it might not have worked on one of them. This is three witnesses. So really, even if one of them is broke, in jail for the rest of his life, doesn't care what a district judge orders him to do, et cetera, is it really going to be the case that all three of them are going to? Now, because, of course, there was no exploration of this authority, we don't know the answer to that question. But, you know, I don't think it takes that much imagination to think that at least one of these witnesses, and maybe all of them, in the face of a district court that was displaying the full magnitude of her authority, or even something, some subset of the magnitude of her authority, would have decided, maybe I'd better answer anyway. And if I've got some reason that I'm under threat of reprisals, if I've got some reason that I'm worried about something, maybe I can say that, say it in camera, all sorts of things could have happened. But here, literally the opposite occurred, where as to the very first witness, the first thing that happens is the court says, I can't do anything about it, right? He, Mr. Johnson says, I have nothing to add, and Mr. Barnett says, I can scarcely see how I'm going to ask him if he refuses to answer my questions, and the court just says, I can't compel him to answer if he's not going to answer, and this is on Excerpts of Record 74. That pattern repeats over and over. So it's a fair question. This is why district judges have so much authority, is because the selection of which tools, we're not saying has to be prescribed by an appellate court. And we understand that the use of these tools is discretionary, as it ought to be. But this sort of, with great power over one's courtroom comes responsibility to make sure that you're aware of the scope of that power and to use it to make sure that the, you know, ends of justice are pursued for, especially in unrepresented litigants. Sotomayor, you seem to argue that what she said suggests that she didn't know of her authority, which is sort of doubtful, one would think. So if one gets over that, I mean, suppose she said, well, you know, I realize I have some authority here, but there's no way it's going to make a difference, I'm not going to do it, do anything. At some point, that becomes an abuse of discretion, doesn't it, even if she understands her authority? Yes. And I think that it's because this is an extreme set of facts that is so outside the mainstream that even if one reads the record as you suggest, which I agree is the most favorable way to read the record for the officers, it is, although, it's hard to think of any good reason for doing nothing for every witness. Now, one can say how far do you have to go, and that's the point of the Second Circuit cases that the officers cite, which is if a district judge makes an effort that they regard as reasonable under the circumstances, appellate courts are probably not going to second-guess that for very good reason. But when literally nothing is done, and it's done not just for one witness, but for every witness, and this is an unrepresented pro se litigant in a civil rights suit, it does become possible to say this is beyond even the, you know, the gentle outer boundary of a true abuse of discretion. If we remand this case, I checked and noticed that Mr. Barnett had asked for counsel many times and never got counsel. Do you have any – is there any possibility that you would represent him at a trial, or is there some way that we could – it doesn't seem to me to make a lot of sense to go back and do it over again without a lawyer. Well, so the scope of our representation at this point is – was directed by this Court to be restricted to this appeal, and I think that the partners of Jones Day might have something to say about me affirmatively answering that question. But certainly one thing I think that the Court could do is say on remand, he is to sort of, you know, a process to be explored where he is to be assigned, you know, CJA counsel or appointed counsel of some kind, because I agree with you that it makes a lot of sense if we're going to run this process again that there should be, you know, counsel on both sides, because that's how we're going to find out what really happened. So I see that the yellow light is on, and if the Court doesn't mind, I'd like to reserve the balance for rebuttal. Thank you. I have a minute and 20 seconds on rebuttal. Good morning, Your Honor. May it please the Court, Janine Jeffrey on behalf of Appellees. I think, Judge Berzon, I think you've picked it up that the Court knew she had discretion. But she said there's nothing I can do, that's what she said. But it was her recognition of the futility of ordering a guy who is a convict who has a 307-year sentence to three days in jail. You know, we have to trust, for all of us who were sitting in the courtroom, I was the trial counsel on the case, these guys walked in, they were ordered by the Court to be there. Two of them said, submitted declarations saying, I don't want to be there, I don't know anything. She ordered them anyway. So to say she didn't do anything isn't accurate. Right. But if they've told the Court that they don't know anything, aren't they at least obligated, once they get on the stand, to say, I don't know anything? But when one of them even refuses to confirm that he was in prison at the same time as the plaintiff, that's just, he's gone limp. That's not somebody who doesn't know anything. That's somebody who's tabula rasa. That just doesn't work. Well, I agree. He said, I don't want anything to do with this. And part of the problem I have That's non-cooperation. That's not saying that I don't know anything relevant to this proceeding. That's saying I'm not going to cooperate with you. I agree. And she didn't make any effort at all to persuade him otherwise. And I think being in the courtroom, it was clear that no effort by her would have made any difference at all. These, all three inmates. Would it be an abuse of discretion not even to attempt that once? I don't believe so. I think it was in her discretion to evaluate the circumstances in front of her. These guys are all long-term, hardened criminals. And they say, I don't want to talk. The concept that if you threaten them with three days of jail, that they're going to say, oh, yeah, well, that does it for me. Or the trust account. I'm sorry. These aren't O'Melveny and Myers clients. They don't have trust accounts where they actually have real money. That suggestion is ludicrous. Her arsenal is so limited. And there's nothing to do in the face of these guys who say, we're not going to talk. Counsel, I can remember a trial when I was a prosecutor where we had a material witness brought in. And the material witness was very afraid of the defendants were going to threaten him. In fact, they had threatened him. And I remember my colleague asked him a question at trial. And he asked about, can you identify the man who threatened you? And the witness said, do I have to? And Judge Jones in San Diego, who has since passed away, said, yes, you do. And even though this man was fearing for his life, knowing that these people had threatened him and threatened his family, he still was ordered to answer the question. Now, here, we didn't even have that. So I don't think we can, yes, they're hardened criminals, no doubt. But there's nothing in the record, unless you can point to something, unless I think collectively we're asking, what is there in the record to show that the judge at least tried something to get these guys to answer questions? She ordered them to court over their objections. Presence. Certainly she ordered them to be there. Yes. Over their objections. But in terms of when a question is asked, what did she do to make them attempt to answer the question? Can you point us to anything in the excerpt of record? Other than to allow the plaintiff to continue to ask questions. I can't. Okay. You're absolutely right. But the problem I have with that is to assume that she didn't know that she had that discretion to take away her power in that to say, there's nothing I can do. She kept saying to the inmate, Mr. Barnett, there's nothing I can do. What do you want me to do? But that's not literally, clearly untrue. I mean, what you're saying is there was nothing she thought perhaps that there was nothing she could do that would work. But that's different from there's nothing I can do. I agree. She can order them to testify. She can meet with them in Cameroon. She can ask them whether anybody's threatened them. She could suggest why they might want to testify. There are things she could do. But I think the logical and fair reading of what she was saying was she didn't think any of those things would be effective. The other part of the problem I have with this is, you know, there's this suggestion that somehow they were threatened by the officers. There's no basis. No. We don't know what happened because nobody asked them. Well, one inmate was asked and he said, no, I wasn't threatened by the officers. But she wasn't asked by the judge. Well, okay. That's true. But he was asked and he said and he answered the question. I wasn't threatened. So I don't know why they were. Well, if they haven't been threatened, then there doesn't seem to be any reason why they couldn't be coaxed to answer the questions. Well, you know. I mean, the threat seems to be, to me, the most logical reason why somebody in that position would not want to testify. I think if you want to talk about prison culture, prisoners who testify against inmates and take the officer's side are threatened by inmates. They become snitches. They become rats. Here's the fundamental problem I have with this case. The plaintiff, from the beginning, said, I was attacked in an unprovoked manner. I never laid a hand on Officer Gamboa. I never touched him. In his post-trial papers, he admits for the very first time that he leveled the attack against the officers. So more likely than not, what happened here, if you want to talk about prison culture, is that these prisoners knew that the plaintiff was the aggressor. And they weren't going to say it because that's how they become the victims of retaliation in prison. Not by prison guards. Counsel, I mean, this is a lot of speculation on everyone's part about prison culture in this prison. It's different and so forth. But I do have a question about your brief. If you have your brief handy, at page 14, footnote 3. And let me know when you're there. I'm there. Okay. It says, the prisoners were transported to the court pursuant to subpoenas, took the witness stand, and asserted their right not to speak. What right is that? Don't they have a right not to speak? It's called the First Amendment. I don't have to talk if I don't want to. Really? In a trial? Yes. I think a First Amendment right is a powerful right. Then why do we send people to prison for not testifying? How do we do that? We do do it. Yes. I agree. So you think there's a First Amendment? Just to be clear, you learn something every day. I can understand a Fifth Amendment right. If you say if I answer these questions, I won't incriminate myself, therefore, I'm asserting that. But I think it's going to be a fundamental change in our justice system if witnesses can opt out by saying, I take the first. I take the fifth, but I take the first. I've never heard of before. Okay. I guess I just look at what happened here as these inmates are dragged into court. They've never said they know anything about anything. They don't want to be involved. They don't want to be snitches. They don't want to tell that the inmate is the one that started the fight. And I have to, I want to go back to that. But if you could get back to my question, if you could, the right. I suspect, you know what, I'm going to withdraw my statement about the First Amendment because I think you're absolutely right and that is a misstatement in my brief and I apologize. Okay. I just want to make sure I hadn't missed something. But please continue with where you were. I just want to talk about the justice of this. Why are we? Counsel, one thing that surprised me was that there seemed to be sort of a dearth of cases that were right on point. So I was just surprised at how few cases. I assumed when I sort of read the facts, I thought, oh, surely, you know, hundreds of courts have had to deal with the question of a recalcitrant witness. And so we'll have some, we'll have various steps that have been taken by various  So I was a little surprised at that. I suspect that problems like this are probably not unknown to the prison discipline system. Are you aware of what prisons have to do when other prisoners have been called to tell the warden what happened in an incident that may result in internal discipline? I have never heard of any discipline ever being issued against an inmate for refusing to give testimony either against another inmate or against an officer. I've simply never heard of that. Do we know of any cases where they haven't testified? And just that I have nothing to contribute to this proceeding? I don't know. I think we did cite a brief in our case, a case in our brief about a disciplinary hearing where, and I'm sorry, I believe it's in the brief about a disciplinary hearing where an inmate refuses to testify. But that's unfortunately part of prison life is the fear of retaliation by other inmates for, against inmates who are considered to be rats or snitches. So if the government, if there were an attack on an officer and a prosecution say for, for assault on an officer and you, there was a prisoner or an inmate who was a witness and was called to testify and didn't testify, you would take the same position? Yes. You would just sit there and say. Anecdotally, Your Honor, I have a case just like that right now where the inmate saw something that's helpful to the officer and he said to me, I will not testify in your case because I don't want to be killed by the inmates. I want out of here. And if he was the only witness and it was the only way to prosecute this person, you would say fine. What can I, that's right, what can I do? I'm going to jeopardize his life? No. And this wasn't an assault on an officer. Mr. Barnett admits that he assaulted the officer in his post-trial papers. So he comes into this courtroom as a perjurer. No, but my point is that when the government is, when it's the government that's trying to get the testimony, ordinarily, and I don't know about the present context, but certainly outside of the present context, extremely virulent about getting people to testify, including putting reporters in jail and, and so on. So the ordinary understanding is that if the government wants to prosecute somebody and somebody else won't testify, they do everything they can to get them to testify. So your position is, but not when it's a prisoner? Well, my position is that this case is very unique because of the fact that they were prisoners and that I don't believe any of the usual contempt proceedings would have made any difference. So I guess I'm not sure what the court's asking me. Would my position be the same? Yes, I think so. I mean, for one thing, of course, one reason it doesn't arise is because the government has tools to entice prisoners to testify. Okay. I mean, I'm not sure what context we're talking about here. Well, for example, in a federal case, you know, I can think of back in cases I worked on where a prisoner might say, look, I will talk, but you have to move me to this cell block and get me out of this cell block. So I think that's what Judge Berzon is referring to, that there are ways to incentivize prisoners to testify, just like any type of witnesses. But I guess what we're asking is that is there any, can you think of any case law or any authority that deals with this situation where the government would just walk away and just say, well, he says he's not going to, so we're not going to try anything? I'm not aware of any situation like you're talking about. I can't speak to that. You know, I represent three individual officers who were falsely accused of unprovokedly attacking this inmate. And it concerns me greatly that that seems to be a completely insignificant factor in this lawsuit, that this man perjured himself. He comes to this court. The court now appears as if it's going to not only reverse the decision, but appoint him counsel when he has, there is no, you know, the plaintiff's brief talks a lot about justice. Where is the justice in an inmate lying to the court, lying to the jury, and then coming in after the fact and saying, well, I was goaded into leveling an assault against the officer? Look, maybe you're right. Maybe he did lie. But I think the plaintiff's contention here is that there was only one side of the coin showed. But here's the other problem. What is the error standard? If the error standard is, as I understand it, was it more probably than not tainted the verdict? If we don't know where these testimony would come out, how can you reverse the decision? Well, but that's because you didn't try to find that out either. I mean, the magistrate judge could have taken each of these people into chambers and said, well, tell me, if you were to testify, what would you say, and make a proffer. So at least we would have the answer to that question, but we don't. Because you do nothing. Well, we have it at least with respect to inmate King. He was very clear. He submitted a declaration that said, I didn't see an excessive force. I don't know anything. I don't have any relevant facts. He said, I did not see any excessive force. Well, that's a relevant fact. Fair enough. That's a relevant fact. But it doesn't help the plaintiff. Don't we have to have a standard where it would have made a difference? And if you can't say it would have made a difference, why do we do it again? Because how are we supposed to know if they made a difference if nobody asked them what they would have said? But if the standard is that the verdict has to be tainted. So you're – okay. A quick question, counsel. Officer Duran, I understand he has been convicted of a crime. Is he – how long is he in for? I can't answer that. I don't know. Okay. Yes, he has been convicted of a crime. Okay. Unrelated to anything in this case. Right. No, I'm just trying to see if there were to be a – if there were to be another trial in this case, I'm just trying to figure out – it's going to get even more complicated, I would imagine, because one of the plaintiffs is in prison now. One of the defendants in this case is in prison himself. That's correct. Okay. I just want to make sure. Thank you, Your Honors. Thank you. So the Second Circuit, in the case that the officers cite, I think it's DeSania, says something that I think is very helpful, which is witnesses say things like this all the time. I don't want – you know, they threaten. They say, don't call me. If you call me, I'm not going to cooperate. I'm going to give evidence that's favorable to the other side. And when these measures fail, they often give evidence.  Witnesses often don't want to cooperate. They say, I don't want to cooperate. It is not a new problem for the justice system. And so there, I think, are a number of tools that could have been used. As to this statement in the post-trial brief, I just want to emphasize that this is an isolated, one-line statement by Mr. Barnett, which, if you read it in context, he's still saying that they used excessive force against him, and I would caution against over-reading the post-trial submission of an unrepresented litigant and the use of the word goaded, you know, rather than something else. I think that's – you know, it might be fair to sort of ask him about it on cross examination in a retrial. But he's not admitting that he did the wrong thing. He's saying in this brief, they used excessive force against me. The only other thing I would say is, as to the standard of review, the burden is usually on the person who benefits from an error to explain why it is – it is not harmless. And even if the burden is on us, I think that in a situation like this, where all of the witnesses for one side in a civil rights case wrongly refuse to say what they know, there is absolutely no way that we can be sure that any of the things that we think they might have been reticent about were true or untrue. For these reasons, we would ask that the judgment below be vacated and the case remanded. Thank you very much. Thank you to counsel. The case of Barnett v. Norman is submitted. And we will go on to Arizona v. Lupie.
judges: Berzon, Bybee, Owens